# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH FRAGAPANE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GENER8 MARITIME, INC., PETER C. GEORGIOPOULOS, ETHAN AUERBACH, NICOLAS BUSCH, DAN ILANY, ADAM PIERCE, ROGER SCHMITZ, STEVEN D. SMITH, EURONAV NV, and EURONAV MI INC.,<br><br>Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Joseph Fragapane ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of Gener8 Maritime, Inc. ("Gener8" or the "Company"), against Gener8, and the Company's Board of Directors (the "Board" or the "Individual Defendants")(collectively with the Company, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company to Euronav NN. ("Parent") and Euronav MI Inc. (the "Merger Sub" and collectively with Parent, "Euronav") as a result of an unfair process for an unfair price, and to enjoin the stockholder vote on a proposed stock for stock transaction valued at approximately $490 million (the "Proposed Transaction").

2.     The terms of the Proposed Transaction were memorialized in a December 20, 2017, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").   Under the terms of the Merger

Agreement, Gener8 will become an indirect wholly-owned subsidiary of Euronav, and Gener8 shareholders will receive 0.7272 shares of Euronav common stock for each share of Gener8 common stock they own.  At the time of the signing of the Merger Agreement, Euronav shares were trading for $8.10, resulting in an approximate valuation of Gener8 shares at $5.89 per share.

3.     Thereafter, on February 14, 2018, Euronav filed a Registration Statement on Schedule F-4 (the "F-4") with the Securities and Exchange Commission (the "SEC") in support of the Proposed Transaction.

4.     The Proposed Transaction is unfair and undervalued for a number of reasons. Significantly, the F-4 describes an insufficient sales process in which the Board only paid lip service to its fiduciary duties by creating a special committee of the Board to serve as a "Transaction Committee" as a workaround to the admittedly conflicted nature of the Board at large.  However, the Transaction Committee members were themselves conflicted due to the fact that they were beholden, employed, or otherwise associated with large, institutional, equity funds whose interests diverge from those of Plaintiff and other public stockholders of Gener8.

5.     These same large institutional investors, amongst others, have signed voting and support agreements totaling 48% of the outstanding stock of Gener8, making the consummation of the Proposed Transaction all but certain.  Compounding this issue, the Merger Agreement contains no "majority of the minority" provisions to protect the interests of the Plaintiff and other public stockholders of the Company.

6.     Compounding the issue, these large institutional investors seem to have different motivations than public stockholders of the Company, with one journalist noting that any bid containing cash considerations was likely unacceptable to such investors, as they are underwater on their initial investments in the Company, having bought in at $14 per share in 2015 when Gener8 went public.  Such disparate interests had consequence in the sales process, and led the Board to reject a cash offer that was made during the sales process by an interested third party that the Company later admitted contained a superior premium to Gener8's stock price than Euronav's all-stock bid.  However, the F-4 does not indicate the value of this bid, so there is no way for

CLASS ACTION COMPLAINT

Plaintiff to know, just how much money the Board left on the table to ensure that these large private equity funds did not take an immediate loss on their investments.

7.      Clearly, the fact that four of the Company's seven directors, including all members of the Transaction Committee, have significant ties with these large private equity investors whose interests are divergent from public stockholders of Gener8, fly in the face of the Company's claim to have a "Majority Independent" Board of Directors, as claimed in its most recent proxy statement filed with the SEC.

8.      Further shirking their fiduciary duties, the Transaction Committee, and the Board at large, decided against conducting any form of market check throughout the sales process.

9.      Next, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits with no thought to the Company's public stockholders.  For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.  Moreover, certain Directors and other insiders will also be the recipients of lucrative change-in-control agreements, triggered upon the termination of their employment as a consequence of the consummation of the Proposed Transaction.

10.      Defendants breached their fiduciary duties to the Company's stockholders by agreeing to the Proposed Transaction which undervalues Gener8 and is the result of a flawed sales process.

11.      As part of such a process, the Board and Company agreed to an incredibly onerous and preclusive termination fee, that would require Gener8 to both pay a cash termination fee of nearly 8% of the deal price, a percentage routinely struck down by Courts and sell nearly 14% of its VLCC fleet to Euronav at a set cost, severely and negatively impacting the Company's ability for future revenues.

12.      In violation of sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and in violation of their fiduciary duties, Defendants caused to be filed the materially deficient F-4 on February 14, 2018 with the United States Securities and Exchange

Commission ("SEC") in an effort to solicit stockholders to vote their Gener8 shares in favor of the Proposed Transaction.  The F-4 is materially deficient and deprives Gener8 stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction.  As detailed below, the F-4 omits and/or misrepresents material information concerning, among other things: (a) the sales process leading up to the Proposed Transaction; (b) the financial projections for Gener8, Euronav, and the potential combined company, provided by Gener8 to the Company's financial advisor UBS Securities LLC ("UBS") for use in its financial analyses; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor, UBS.

13.     Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from violation of the federal securities laws by Defendants.

## PARTIES

14.     Plaintiff is a citizen of Quebec, Canada and, at all times relevant hereto, has been a Gener8 stockholder.

15.     Defendant Gener8 engages in the transportation of international seaborne crude oil and petroleum products.  As of March 13, 2017, it owned a fleet of 41 vessels, including 25 very large crude carriers ("VLCCs"), 10 suezmax vessels, 4 aframax vessels, and 2 panamax vessels, with an aggregate carrying capacity of 9.7 million deadweight tons.  Gener8 is organized under the laws of the Republic of the Marshall Islands and has its principal place of business at 299 Park Avenue, New York, NY 10171.  Shares of Gener8 common stock are traded on the New York Stock Exchange ("NYSE") under the symbol "GNRT"

16.     Defendant Peter C. Georgiopoulos ("Georgiopoulos") has been a Director of the Company at all relevant times.  In addition, Georgiopoulos serves as the Company's Chief Executive Officer ("CEO") and as Chairman of the Company Board.

17.     Defendant Ethan Auerbach ("Auerbach") has been a director of the Company at all relevant times.   In addition, Auerbach serves on the Board's Compensation Committee. Defendant Auerbach is a former manager and partner at, and is associated with the private equity fund BlueMountain Capital Management, LLC ("BlueMountain") a private equity fund that, along with its related entities, own 9.4% of outstanding Gener8 stock.   Defendant Auerbach was appointed to the Transaction Committee of the Board to manage the sales process that lead to the Proposed Transaction.

18.     Defendant Nicolas Busch ("Busch") has been a director of the Company at all relevant times.   In addition, Busch serves as a voting member of the Strategic Management Committee.

19.     Defendant Dan Ilany ("Ilany") has been a director of the Company at all relevant times.  In addition, Ilany serves on the Board's Audit and Compensation Committees.  Defendant Ilany is a senior vice president at Avenue Capital Group ("Avenue") a private equity fund that, along with its related entities, own 9.4% of outstanding Gener8 stock.

20.     Defendant Adam Pierce ("Pierce") has been a director of the Company at all relevant times.   Defendant Pierce, is currently a managing director with Oaktree Capital Management, L.P. ("Oaktree") a private equity fund that, along with its related entities, own 15.7% of outstanding Gener8 stock.   Defendant Pierce was appointed to the Transaction Committee of the Board to manage the sales process that lead to the Proposed Transaction.

21.     Defendant Roger Schmitz ("Schmitz") has been a director of the Company at all relevant times.  In addition, Schmitz serves on the Board's Audit and Nominating Committees.

22.     Defendant Steven K. Smith ("Smith") has been a director of the Company at all relevant times.   In addition, Smith serves as the Chair of the Board's Audit and Compensation Committees, and as a member on the Board's and Nominating Committee.  Defendant Smith is currently the managing partner of Aurora Resurgence Management Partners LLC ("Aurora") a private equity fund that, along with its related entities, own 7.6% of outstanding Gener8 stock. Defendant Smith was appointed as the Chair of the Transaction Committee of the Board to manage the sales process that lead to the Proposed Transaction.

CLASS ACTION COMPLAINT

23.     Defendants Georgiopoulos, Auerbach, Ilany, Pierce, Schmitz, and Smith identified in ¶¶ 16 - 22 are collectively referred to as the "Individual Defendants."

24.     Parent together with its subsidiaries, owns, operates, and manages a fleet of vessels for the ocean transportation and storage of crude oil and petroleum products worldwide.  Parent operates through two segments, Tankers; and Floating Production, Storage, and Offloading Operations.  As of August 23, 2017, it owned and operated a fleet of 56 double hulled vessels, including 30 VLCCs, 1 V-Plus vessel, 19 Suezmax vessels, and 2 floating, storage, and offloading vessels, as well as 4 Suezmax vessels under construction.  Parent is a corporation organized under the laws of the Kingdom of Belgium and has its principal place of business at De Gerlachekaai 20, Antwerp C9 2000, Belgium.  Parent common stock is traded on the NYSE under the ticker symbol "EURN."

25.     Merger Sub is a Marshall Islands corporation and a wholly owned subsidiary of Parent, and can be served care of parent.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

27.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Gener8 has its principal place of business is located in this District, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

29.     Moreover, by the explicit terms of the Merger Agreement:

EACH OF THE PARTIES CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN MANHATTAN IN NEW YORK CITY OR IN THE FEDERAL SOUTHERN DISTRICT IN THE STATE OF NEW YORK AND ANY APPELLATE COURT THEREFROM LOCATED IN NEW YORK, NEW YORK AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS RELATING TO THIS AGREEMENT, THE MERGER OR THE OTHER TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT MAY BE LITIGATED IN SUCH COURTS.

Merger Agreement, § 11.8.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Gener8 common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

31.     This action is properly maintainable as a class action because:

a.   The Class is so numerous that joinder of all members is impracticable.  As of November 3, 2017, there were more than 82 million common shares of Gener8 stock outstanding.  The actual number of public stockholders of Gener8 will be ascertained through discovery;

b.   There are questions of law and fact which are common to the Class, including *inter alia*, the following:

i.   Whether Defendants have violated the federal securities laws;

ii.   Whether Defendants made material misrepresentations and/or omitted material facts in the F-4; and

iii.   Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated.

c.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f.  Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES**

32.  By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Gener8 and owe the Company the duties of due care, loyalty, and good faith.

33.  By virtue of their positions as directors and/or officers of Gener8, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Gener8 to engage in the practices complained of herein.

34.  Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

a.  act with the requisite diligence and due care that is reasonable under the circumstances;

b.  act in the best interest of the company;

c.  use reasonable means to obtain material information relating to a given action or decision;

d.  refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

e.  avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

f.  disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

35.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Gener8, are obligated to refrain from:

a.     participating in any transaction where the directors' or officers' loyalties are divided;

b.     participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

c.     unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

CLASS ACTION COMPLAINT

36.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Gener8, Plaintiff and the other public stockholders of Gener8, including their duties of loyalty, good faith, and due care.

37.     As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Gener8 common stock in the Proposed Transaction.

**SUBSTANTIVE ALLEGATIONS**

*Company Background*

38.     Gener8 engages in the transportation of international seaborne crude oil and petroleum products.  As of March 13, 2017, it owned a fleet of 41 vessels, including 25 VLCCs, 10 suezmax vessels, 4 aframax vessels, and 2 panamax vessels, with an aggregate carrying capacity of 9.7 million deadweight tons.

39.     The Company's most recent financial performance press release before the announcement of the Proposed Transaction indicated sustained and solid financial performance. For example, in a November 9, 2017 press release announcing its 2017 Q3 financial results, the Company noted such financial highlights as an increase in the fleet "ECO" operating days from 35.6% in the previous quarter to 57.4% and entering into a series of transactions that are expected to increase cash by $99.2 million in the coming months.

40.     Speaking on these positive results, Defendant CEO and Chairman Georgiopoulos stated, "We have taken a series of steps this year to enhance our fleet profile, increase liquidity, and improve our balance sheet."

41.     Georgiopoulos continued, noting that he expects future success from Gener8, by stating, "By the end of this year, we expect that over 75% of our fleet will be comprised of ECO VLCCs on a DWT basis.  The incremental earnings potential of our ECO VLCCs has been demonstrated over a number of quarters in both weak and strong tanker markets.  Combined with reduced breakeven costs resulting from our unscheduled debt repayments, we believe that we have

positioned Gener8 to stay competitive in the current weak rate environment and outperform the market when it recovers."

42.     These positive results are not an anomaly, but rather, are indicative of a trend of continued financial success by Gener8.   For example, in an August 1, 2017 press release announcing the Company's 2017 Q2 financial results, Gener8 reported such positive results as an increase in vessel operating days by 18% year-on-year, and an increase in full fleet "ECO" operating days of 54.2% over the previous quarter.

43.     Speaking on these results, Defendant Georgiopoulos stated, "We continue to dispose of older vessels, streamlining our fleet and focusing on high quality tonnage with the best return profile.  This strengthens our competitive position in the market.  We believe the strategy we are pursuing is prudent and reflects our approach to managing our balance sheet and market exposure."

44.     The financial progress of the Company was also noted in the F-4, which noted on Gener8's performance between 2016 and 2017 that, "By the end of the third quarter of 2017, Gener8's cash had doubled from the amount at the end of 2016."

45.     Clearly, based upon these positive financial results, the Company is likely to have tremendous future success and should command a much higher consideration than the amount contained within the Proposed Transaction.

46.     Despite this upward trajectory and continually increasing financial results, the Individual Defendants have caused Gener8 to enter into the Proposed Transaction for insufficient consideration.

***The Flawed Sales Process***

47.     As detailed in the F-4, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to Euronav.

48.     First and foremost, the F-4 is impermissibly vague, omitting vital information regarding the valuation of various proposed third-party bids throughout the sales process.  For example, bids by Company E in April 2017, by Company A in May 2017, Company F in July

2017, Company G in October 2017, and Company G in November 2017, were all described in vague terms such as having a "discount" or "premium" to the Company's current stock price without ever specifically identifying the terms of each specific received bid, which should include the cash consideration offered in cash bids, and/or the stock exchange ratio and approximate cash value to Company stockholders in stock bids.  Without such information Gener8 stockholders are completely unable to gauge the validity of the consideration contained in the Proposed Transaction, or the sales process leading up to it.

49.    This lack of transparency regarding the valuation of competing bids is especially alarming when considering that, by the express terms of the F-4, the proposal made by Company G on November 13, 2017, "***represented a greater premium than the implied premium reflected in Euronav's proposal***."  Despite this fact, the Company chose to enter into exclusivity with Euronav within a week of the Company G proposal to negotiate based on the inferior premium, and one that did not change after that point.  Without the specific valuation of the Company G bid, Plaintiff and other public Gener8 stockholders are completely unable to determine how much potential value was given up by the Board.

50.    The F-4 also addresses a sales process that was slanted towards Euronav from the beginning, and was anything but disinterested.

51.    While the F-4 claims that a committee of disinterested directors was formed to "among other things, consider, evaluate and negotiate the terms of possible transactions," such a committee was mere lip-service to the actual fiduciary duties the Board was obligated to pursue during the process.  As an initial matter, the members of the Transaction Committee, Defendants Auerbach, Pierce, and Smith are all associated with and/or employed directly by private equity funds controlling significant portions of Company stock.  Defendant Auerbach is a former manager and partner at, and is associated with, BlueMountain that, along with its related entities, own 9.4% of outstanding Gener8 stock; Defendant Pierce, is currently a managing director with Oaktree that, along with its related entities, own 15.7% of outstanding Gener8 stock; and Defendant Smith is currently the managing partner of Aurora which, along with its related entities, own 7.6% of outstanding Gener8 stock.

CLASS ACTION COMPLAINT

52.     BlueMountain, Oaktree, and Aurora, are all signatories to voting and support agreements that, along with other institutional investor support, totals 48% of outstanding Company stock pledged to support the Proposed Transaction, all but ensuring that the Proposed Transaction is pushed through.  Clearly, the inclusion of representatives of these funds on the so-called "Transaction Committee" is extremely problematic, as they are not disinterested and as set forth herein, their interests are clearly divergent of those of the public stockholders of Gener8.

53.     The fact that so many members of the Board were simply stand ins for large private equity funds is problematic given the divergent nature of the interests of these funds and those of the public stockholders of Gener8 writ large.  As reported by Joe Brady in a February 22, 2018 article in the shipping industry periodical *Trade Winds*, it is likely that the Board preferred an all-cash combination due to the fact that the group of "private equity investors are 'under water' on their investments in Gener8, which went public at $14 in 2015 and was below $6 this week."  Even a substantially higher cash offer, "…essentially would have forced the [private equity] firms to "mark to market" their losses.  An all-stock deal at least keeps alive the possibility that future gains in the share price of the combined company could rescue their returns."

54.     In addition, at no point does the F-4 give specific information as to the scope of powers of the Transaction Committee in recommending and/or approving a potential bid to the full Board or if it had veto power over potential strategic alternatives.

55.     It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate manner, with an obvious end-goal of a Euronav transaction.  For example, despite receiving several indications of interest regarding proposed strategic alternatives from various third parties, including Euronav, as early as mid-2016, and additional parties throughout the sales process, neither the Board nor the so-called independent Transaction Committee thought it proper to conduct a market check at any point for additional interested third parties.

56.     This flawed management of the sales process also led to the entry into exclusivity with Euronav to finalize the terms of the Proposed Transaction, which contained an implied value

that was *expressly admitted in the F-4 to be lower than the amount offered in the Company G bid proposed a mere week before hand*.

57.      Moreover, the F-4 is unclear as to the nature of specific confidentiality and/or non-disclosure agreements Gener8 entered into with various third parties and Euronav throughout the sales process, if any such agreements were different from one another, the terms of any included "don't-ask, don't-waive" provisions or standstill provisions in those agreements, and if so, the specific conditions, if any, under which such provisions would fall away or prevent parties from submitting a bid.  This fact is particularly relevant given the higher bids acknowledged by the Company.

***The Proposed Transaction***

58.      On January 31, 2018, Gener8 and Euronav issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> **ANTWERP, Belgium, and New York, New York, 21 December 2017** – The Boards of Euronav NV (NYSE: EURN & Euronext: EURN) ("Euronav" or the "Company") and Gener8 Maritime, Inc. (NYSE: GNRT) ("Gener8") are pleased to announce that they have reached an agreement on a stock-for-stock merger for the entire issued and outstanding share capital of Gener8 pursuant to which Gener8 would become a wholly-owned subsidiary of Euronav (the merger to form the "Combined Entity").
>
> The merger will create the leading independent large crude tanker operator including:
>
> ·   75 crude tankers, including 44 VLCCs and 28 Suezmax crude tankers, representing over 18 million DWT in the aggregate.
> ·   Combined Entity balance sheet assets of over USD 4 billion.
> ·   Estimated pro-forma market capitalization of approximately USD 1.8 billion based on Euronav's closing price of USD 8.10 per share on 20 December 2017.
> ·   Marked-to-market leverage of less than 50% for the Combined Entity.
> ·   A liquidity position estimated at more than USD 750 million, including cash on hand and undrawn amounts available under existing credit facilities.
>
> KEY TRANSACTION TERMS

- 0.7272 Euronav shares for each share of Gener8 (the "Exchange Ratio") which is expected to result in the issuance of approximately 60.9 million new Euronav shares to Gener8 shareholders.
- The Exchange Ratio was calculated on the basis of several factors, including a relative net asset value (NAV) methodology analysis.
- The Exchange Ratio implies a premium of 35% paid on Gener8 shares based on the closing share prices on 20 December 2017.
- The merger will result in Euronav shareholders owning approximately 72% of the issued share capital of the Combined Entity and Gener8 shareholders owning approximately 28% (based on the fully diluted share capital of Euronav and the fully diluted share capital of Gener8).
- The merger is subject to the approval of Gener8's shareholders, the consent of certain of Gener8's lenders to assign certain debt facilities to the Combined Entity, the effectiveness of a registration statement to be filed by Euronav with the U.S. Securities and Exchange Commission (the "SEC") to register the Euronav shares to be issued in the merger (the "New Registration Statement"), the listing of such shares on the New York Stock Exchange (the "NYSE") and other customary closing conditions.
- No additional equity issuance is currently contemplated beyond the approximately 60.9 million Euronav shares to be issued in exchange for Gener8 shares.
- Euronav as the Combined Entity will remain listed on NYSE and Euronext under the symbol "EURN."
- Carl Steen, Paddy Rodgers and Hugo De Stoop will remain respectively Chairman of the Board, CEO and CFO of the Combined Entity.
- The merger will require the approval of the holders of a majority of Gener8's outstanding shares. A group of shareholders, representing approximately 48% of the issued and outstanding shares of Gener8, including certain current directors of Gener8, have committed or are expected to commit shortly to vote in favour of this merger, subject to the terms and conditions contained in voting agreements with Euronav.
- A reputable third-party tanker owner has agreed to purchase from the Combined Entity six modern VLCCs upon closing of this transaction at a price of USD 434 million. The sale will allow Euronav to maintain sustainable and robust financial ratios and keep leverage and liquidity well within Management's desired levels.

The Euronav NV board has unanimously approved the transaction and the merger does not require the approval of Euronav's shareholders.

Euronav and Gener8 believe that the merger will:

- Be accretive to the shareholders of both companies and is consistent with previously set expansion criteria of Euronav.
- Create the world's leading independent crude tanker operator with 75 large crude tankers focused predominately on the VLCC and Suezmax asset classes and two FSO vessels in joint venture.

CLASS ACTION COMPLAINT

· Provide tangible economies of scale via pooling arrangements, procurement opportunities, reduced overhead and enhanced access to capital.
· Offer a well-capitalised, highly liquid company for investors to participate in the tanker market.
· Through commitment to the Tankers International Pool (a spot market-oriented tanker pool), provide the lowest commercial fees as a percentage of revenue in the sector upon closing of the merger.
· Allow Euronav to retain the same disciplined dividend policy for the Combined Entity.

One of the independent Board members of Gener8, Steve Smith, is expected to join the Board of Euronav following completion of the merger, which is expected by the latest end June 2018.

In arriving at the Exchange Ratio, Euronav has taken into account a number of factors including the estimated net asset values of each company, the recent share price performance of the two companies, and the opportunity to combine two tanker fleets with good prospects for stronger combined growth.

The Gener8 board believes that the terms of the merger are in the best interests of Gener8 shareholders.

The Euronav Board considers the merger to be in the best interests of Euronav shareholders as a whole and has unanimously approved the transaction.

For further information about the Merger, please refer to the New Registration Statement to be filed with the SEC by Euronav and the proxy statement to be filed by Gener8.

Commenting on the merger, Carl Steen, Chairman of Euronav said: "The merger between Euronav and Gener8 is expected to deliver real value for both sets of shareholders. The financial strength of the Combined Entity together with a strong leadership team will make it well placed to navigate the tanker cycle".

Paddy Rodgers, CEO of Euronav said: "This transaction marks an exciting development for Euronav. The merger creates the leading tanker company which is better placed to serve the needs of our customers and support our partners."

Peter Georgiopoulos, Chairman and CEO of Gener8 said: "I have been a vocal advocate for consolidation in the shipping industry and have always stated that we would be a willing buyer or seller depending upon what is best for our shareholders.  This transaction creates the largest independent VLCC fleet in the world.  The combined company has a very bright future that will benefit both Gener8 and Euronav shareholders."

ADVISORS

Seward & Kissel LLP is serving as legal counsel to Euronav in connection with the merger, Shearman & Sterling LLP is serving as legal counsel to the transaction committee of Gener8 and Kramer Levin Naftalis & Fankel LLP is serving as legal counsel to Gener8.   RMK Maritime is serving as financial advisor to Euronav's Board of directors and UBS Securities LLC is serving as financial advisor to Gener8. For Belgian law matters, Euronav was advised by Argo Law.

***The Inadequate Merger Consideration***

59.     Significantly, the Company's financial prospects and opportunities for future growth, and synergies with Euronav establish the inadequacy of the merger consideration.

60.     First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration how the Company is performing, considering key financial improvements and increases in the cash position of the Company in recent years.

61.     For example, financial analysts at Jefferies Group valued the Company as high as $10.00 per share only three days before the announcement of the Proposed Transaction, a value more than 69.78% greater than that contained in the implied value contained in the Proposed Transaction.

62.     Moreover, the Company's stock has traded as high as $6.12 per share within a six-month period before the announcement of the proposed transaction, or a value more than 3.9% greater than that contained in the Proposed Transaction.

63.     Additionally, Gener8's future success is extremely likely, given the consistent increases in its cash on hand, and its steady achievement financial milestones associated with its rollouts of ECO VLCC class of ships.  Obviously, the opportunity to invest in such a company on the rise is a great coup for Euronav, however it undercuts the investment of Plaintiff and all other public stockholders.

64.     Finally, the Proposed Transaction represents a significant synergistic benefit to Euronav, which operates in the same industry as Gener8, and will use the new assets, ships, and brand capital to bolster its own position in the market.  Specifically, Paddy Rodgers, CEO of Euronav noted in the press release announcing the Proposed Transaction that, "This transaction

1    marks an exciting development for Euronav.  The merger creates the leading tanker company

2    which is better placed to serve the needs of our customers and support our partner."

3        65.    Additionally, Defendant Georgiopoulos notes that the combined company will

4    operate "the largest independent VLCC fleet in the world".

5        66.    Clearly, while the deal will be beneficial to Euronav it comes at great expense to

6    Plaintiff and other public stockholders of the Company.

7        67.    Moreover, post-closure, Gener8 stockholders will see their voting power

8    significantly shrink as stockholders of Euronav, with their ownership share in the surviving entity

9    being significantly smaller than their current holdings, thus shrinking any future benefit from their

10   investment in Gener8.

11       68.    It is clear from these statements and the facts set forth herein that this deal is

12   designed to maximize benefits for Euronav at the expense of Gener8 stockholders, which clearly

13   indicates that Gener8 stockholders were not an overriding concern in the formation of the Proposed

14   Transaction.

15   ***Preclusive Deal Mechanisms***

16       69.    The Merger Agreement contains certain provisions that unduly benefit Euronav by

17   making an alternative transaction either prohibitively expensive or otherwise impossible.

18   Significantly, the Merger Agreement contains a termination fee provision that is especially onerous

19   and impermissible.  Notably, in the event of termination, the merger agreement requires, under

20   certain circumstances, for Gener8 to sell to Euronav, three vessels, namely the *Gener8 Hera*, the

21   *Gener8 Athena*, and the *Gener8 Neptune*, for a set price of $220.9 million.  That amount represents

22   approximately 45% of the value of the Proposed Transaction.  The merger agreement indicates

23   that a portion of the purchase price of each of the three vessels ***can be offset by Euronav*** by up to

24   one-third of the $39 million termination fee contemplated in the Merger Agreement.  As a result,

25   Euronav would actually be able to purchase the vessels for $181,900,000.  Gener8 will also be

26   required to pay up to $39 million to Euronav under these circumstances if the Merger Agreement

27   is terminated under certain circumstances.  Moreover, under one circumstance, Gener8 must pay

28   this termination fee even if it consummates any competing Acquisition Proposal (as defined in the

Merger Agreement) *within 12 months following the termination* of the Merger Agreement. The termination fee will make the Company that much more expensive to acquire for potential purchasers. The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

70. Courts have routinely held that termination fees above 4% are generally unreasonable and may have a preclusive effect on third party bids. Notably, here the termination fee of $39 million represents approximately 8% of the total equity value of the Proposed Transaction – nearly double the amount of what is usually permitted by Courts.

71. Additionally, this termination fee structure is especially onerous as it contemplates not only a transfer of great monetary value but a transfer of three of Gener8's ships of its VLCC class – its largest and most profitable ships. Notably, at the price Euronav has agreed to pay, these three ships represent approximately 45% of the entire value of the Proposed Transaction. The fact that all of a shipping company's revenue depends on the use of such ships, and such ships high up-front costs, render the termination fee in this case astronomically high when considering the future earnings potentials of these three vessels.

72. As such, not only will this preclusive termination fee cause the Company to lose significant liquid value immediately, that effect will be accretive going forward with the loss of a significant source of earnings potential, and make the Company significantly less attractive to any potential third-party bidders.

73. The Merger Agreement also contains a "No Solicitation" provision that restricts Gener8 from considering alternative acquisition proposals by, *inter alia*, constraining Gener8's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide *"Acquisition Proposal"* if it constitutes or is reasonably calculated to lead to a *"Superior Proposal"* as defined in the Merger Agreement.

74. Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, the Individual Defendants agreed to provide Euronav information in

CLASS ACTION COMPLAINT

order to match any other offer, thus providing Euronav' access to the unsolicited bidder's financial information and giving Euronav the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Euronav.

75.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

76.     In addition, the Merger Agreement does not include protections to ensure that the consideration payable to shareholders will remain within a range of reasonableness.  In a conventional transaction which contemplates stock of the acquiring company as a whole or part of the consideration offered in the Proposed Transaction, the parties often negotiate and implement a "floor" on the value of the consideration payable to shareholders, which establishes the lowest possible price payable.  Such transactions also often include a "collar," which establishes parameters that attempt to minimize the impact of stock price fluctuations on the value of the consideration payable to shareholders.  The Merger Agreement contains none of these protections.  Rather, the Merger Agreement contains a *fixed* exchange ratio of 0.7272 which means that Gener8 shareholders will receive 0.7272 shares of Euronav common stock for each of their shares, *regardless of Euronav's stock price at the close of the transaction*.  Thus, the consideration payable to Gener8 shareholders is not insulated from fluctuations in Euronav's stock price, and shareholders are left in the precarious position of not knowing whether the consideration payable to them will decline further.

77.     Finally, at the same time that the Company entered into the Merger Agreement, certain large shareholders of Gener8, entered into an agreement with Euronav pursuant to which such individuals and entities have agreed, among other things, to vote their shares of common stock of the Company in favor of the approval of the Merger Agreement at a meeting of the Company's stockholders to be held for the purpose of approving the Merger Agreement.  Collectively, the signatories of the Voting and Support Agreement own approximately 48% of all Gener8 outstanding shares, thus all but ensuring that the Proposed Transaction will be pushed

1    through.   Significantly, the Merger agreement does not contain any "majority of the minority

2    provision" in order to protect Plaintiff and other public stockholders.   As such, only 2% of the

3    public stockholders must vote in favor of the Proposed Transaction in order for it to be

4    consummated.

5         78.    Accordingly, the Company's true value is compromised by the consideration

6    offered in the Proposed Transaction.

7    ***Potential Conflicts of Interest***

8         79.    The sales process as indicated in the F-4 leading up to the Proposed Transaction

9    indicate serious flaws in the supposed unbiased nature of the decision to enter into the Proposed

10   Transaction.

11        80.    In its most recent proxy statement, filed on Schedule 14A with the SEC on April 6,

12   2017, the Company stated plainly that, "It is the Board's objective that a majority of the Board

13   consist of independent directors."   Specifically, it lists Defendants Auerbach, Ilany, Schmitz, and

14   Smith as so-called, Independent Directors.

15        81.    Clearly, based upon the facts set forth in the F-4, the statement regarding the

16   independence of the Gener8 board is simply untrue.

17        82.    As stated above, Defendants Auerbach and Smith, both members of the Transaction

18   Committee (with Smith chairing) are closely related to the large private equity funds of

19   BlueMountain and Aurora, respectively.   Auerbach, is a former manager and partner at

20   BlueMountain and is still associated with the fund.  Even more worrisome, Smith, the Chair of the

21   Transaction Committee ***is currently the managing partner of Aurora, a position he held through***

22   ***the sales process***.

23        83.    In addition to the conflicted members of the Transaction Committee, Defendant

24   Ilany, is a senior vice president at Avenue.  Moreover, the F-4 indicates, contrary to the position

25   of Gener8's April 2017 proxy that Ilany is "independent", during the sales process it was

26   determined that Defendant Ilany was conflicted and therefore should and did abstain from taking

27   part in or voting regarding the Proposed Transaction.

28

84.     The fact that so many members of the Board were simply stand ins for large private equity funds is problematic given the divergent nature of the interests of these funds and those of the public stockholders of Gener8 writ large.  As reported by Joe Brady in a February 22, 2018 article in the shipping industry periodical *Trade Winds*, it is likely that the Board preferred an all-cash combination due to the fact that the group of "private equity investors are 'under water' on their investments in Gener8, which went public at $14 in 2015 and was below $6 this week."  Even a substantially higher cash offer, "…essentially would have forced the [private equity] firms to "mark to market" their losses.  An all-stock deal at least keeps alive the possibility that future gains in the share price of the combined company could rescue their returns."

85.     Therefore, an all cash offer, even one with ***an admitted higher premium*** such as Company G's, would have been unacceptable to the large private equity investors, and by extension their agents on the Transaction Committee.  Such clear conflicts of interests running through Proposed Transaction should send a clear signal that this deal is not in the best interest of the public stockholders of Gener8.

86.     Given the aforementioned, it is of significant note that, with Defendants Georgiopoulos, Ilany, and Busch abstaining from taking part in or voting on the Proposed Transaction, it appears that out of the remaining four Individual Defendants who took part in the sales process, only Defendant Schmitz was truly independent form any influence of large private equity funds whose interests so clearly diverge from that of the public stockholders of Gener8. Paradoxically, Defendant Schmitz was also the only member of the Board who voted on the Proposed Transaction that was not a part of the Transaction Committee.

87.     In addition to the clearly flawed objective nature of the Board members who voted on the Proposed Transaction, the breakdown of the benefits of the deal indicate that Gener8 insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will

have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Gener8.

88.    Certain insiders stand to receive massive financial benefits as a result of the Proposed Transaction.  Notably, Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for significant stakes in the combined corporation upon the consummation of the Proposed Transaction as follows:

| Name | Number of Shares | Percentage Owned(17) |
|---|---|---|
| Certain funds managed by Oaktree(1) | 13,062,118 | 15.7% |
| BlueMountain Capital Management, LLC(2) | 7,842,904 | 9.4% |
| Certain funds managed by Avenue Capital Group(3) | 7,212,814 | 8.7% |
| Certain funds affiliated with Aurora(4) | 6,264,594 | 7.6% |
| BlackRock, Inc.(5) | 7,968,633 | 10.7% |
| Executive Officers and Directors:(6) | | |
| Peter C. Georgiopoulos(7) | 1,365,103 | 1.6% |
| Leonard J. Vrondissis(8) | 83,495 | * |
| John P. Tavlarios(9) | 67,110 | * |
| Milton H. Gonzales, Jr.(10) | 41,944 | * |
| Sean Bradley(11) | 41,944 | * |
| Ethan Auerbach(2)(12) | 3,228,512 | 2.9% |
| Nicolas Busch(13) | 9,584 | * |
| Dan Ilany(14) | — | — |
| Adam Pierce(15) | 9,584 | * |
| Roger Schmitz(16) | 9,584 | * |
| Steven D. Smith(4) | 6,264,594 | 7.6% |
| l Directors and named executives as a group (11 persons) | 11,121,346 | 13.4% |

89.    Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option, will be canceled and converted into the right to the merger

- 23 -

consideration.  As detailed below, certain of the Individual Defendants and Company insiders own hundreds of thousands of Company options for which they will receive consideration:

| Name of Executive Officer | Number of Gener8 shares subject to options | Estimated value(1) |
|---|---|---|
| Peter C. Georgiopoulos | 500,000 | $  — |
| Leonard J. Vrondissis | 25,000 | $  — |

90.     Additionally, upon the consummation of the Proposed Transaction, each outstanding Company restricted stock unit ("RSU"), will be canceled and converted into the right to the merger consideration.  As detailed below, certain of the Individual Defendants and Company insiders own hundreds of thousands of Company RSUs for which they will receive consideration:

| Name of Executive Officer or Director | Number of Gener8 shares subject to restricted stock units | Estimated value(1) |
|---|---|---|
| Peter C. Georgiopoulos (Executive Officer and Director) | 216,276 | $ |
| Leonard J. Vrondissis (Executive Officer) | 41,591 | $ |
| John P. Tavlarios (Executive Officer) | 26,618 | $ |
| Milton H. Gonzales Jr. (Executive Officer) | 16,636 | $ |
| Sean Bradley (Executive Officer) | 16,636 | $ |
| Nicolas Busch (Director)(2) | 11,214 | $ |
| Adam Pierce (Director) (2) | 11,214 | $ |
| Ethan Auerbach (Director) (2) | 11,214 | $ |
| Roger Schmitz (Director) (2) | 11,214 | $ |

91.     Moreover, certain employment agreements with all Gener8 executives, including certain directors, are entitled to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by Gener8's common stockholders.

92.     Additionally, at least one known Company Board member, Individual Defendant Smith, will continue in his role of a Director on the Euronav Board of Directors.  Such employment

carries with it significant compensation not shared amongst Plaintiff or Gener8 public stockholders.

93. It is no wonder that, in light of the extremely lucrative profits for themselves, the Board allowed the Company to be sold far under its proper value in order to secure a quick sale.

94. Thus, while the Proposed Transaction is not in the best interests of Gener8 stockholders, it will produce lucrative benefits for the Company's officers and directors.

**The Materially Misleading and/or Incomplete F-4**

95. On February 14, 2018, Euronav filed with the SEC a materially misleading and incomplete F-4 that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

96. Specifically, the F-4 fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Proxy fails to disclose:

      a. The F-4 fails to disclose sufficient information regarding the number and nature of all confidentiality agreements entered into between Gener8 and any interested third party during the sales process, if their terms differed from one another, and if they contained "don't-ask, don't-waive" or standstill provisions, and if so, the specific conditions, if any, under which such provisions would fall away or prevent parties from submitting a bid.

      b. The F-4 fails to disclose information regarding the specific valuation of various proposed third-party bids throughout the sales process, including bids by Company E in April 2017, by Company A in May 2017, by Company F in July 2017, by Company G in April 2017, and by Company G in May 2017.  More complete valuation information including specific per share valuations of all

such bids (or approximate per share valuations in the case of bids including stock compensation) is required;

c. The F-4 fails to disclose the specific reasoning as to why the Board decided to enter exclusivity with Euronav given that the May 2017 Company G bid "represented a greater premium than the implied premium reflected in Euronav's proposal";

d. The F-4 fails to disclose the basis for stating that the Transaction Committee was "disinterested" or "independent";

e. The F-4 fails to disclose sufficient information regarding what specific powers the Transaction Committee had in relation to approval or denial of proposed strategic alternatives;

f. The F-4 fails to disclose any reasoning whatsoever for the failure to perform a market check for potentially interested third parties at any point during the sales process; and

g. The F-4 fails to disclose the basis for the Company ageeing to the onerous terms of the Termination Agreement.

*Omissions and/or Material Misrepresentations Concerning Gener8's Financial Projections*

97.    The F-4 fails to provide material information concerning financial projections provided by Gener8's management and relied upon by UBS in its analyses.  The F-4 discloses management-prepared financial projections for the Company which are materially misleading. The F-4 indicates that in connection with the rendering of UBS's fairness opinion, UBS reviewed "reviewed certain internal financial information and other data relating to the business and financial prospects of Gener8 that were not publicly available, including financial forecasts and estimates prepared by management of Gener8 that he Gener8 Transaction Committee and the Gener8 board of directors directed UBS to utilize for purpose of its analysis."  Accordingly, the F-4 should have, but fails to provide, certain information in the projections that Gener8's management provided to the Board and UBS.  Courts have uniformly stated that "projections …

CLASS ACTION COMPLAINT

1   are probably among the most highly-prized disclosures by investors.  Investors can come up with

2   their own estimates of discount rates or [] market multiples.  What they cannot hope to do is

3   replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc.*

4   *S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

5        98.    The F-4 fails to provide material information concerning the financial projections

6   prepared by Gener8 management.  Specifically, the F-4 fails to disclose the material line items for

7   the following metrics:

8        a.   The line items used to calculate VLCC Time Charter Equivalent ("TCE"),

9           including:

10            i.   total operating days;

11            ii.   voyage revenues; and

12            iii.   voyage expenses.

13        b.   The line items used to calculate net voyage revenues, including:

14            i.   voyage revenues; and

15            ii.   voyage expenses.

16        c.   The line items used to calculate adjusted EBITDA, including:

17            i.   income;

18            ii.   gains (losses) on vessel sales;

19            iii.   interest expense (including commitment fees);

20            iv.   impact of interest rate swaps fair value;

21            v.   professional fees related to interest rate swaps;

22            vi.   depreciation;

23            vii.   non-cash G&A such as stock compensation;

24           viii.   other financing costs;

25            ix.   loss on litigation; and

26            x.   other items, if any that neither relate to the ordinary course of Gener8's

27               business nor reflect Gener8's underlying business performance.

28        d.   The line items used to calculate unlevered free cash flow, including:

i.   Proceeds from vessel sales;

ii.  Changes in working capital;

iii. Drydock capital expenditures;

iv.  Capital expenditures for newbuild vessels

99.     Additionally, the F-4 provides several non-International Financial Reporting Standards ("IFRS") financial metrics, including net voyage revenues, adjusted EBITDA, and unlevered free cash flows, but fails disclose a reconciliation of all non-IFRS to IFRS metrics.

100.    This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

101.    Without accurate projection data presented in the F-4, Plaintiff and other stockholders of Gener8 are unable to properly evaluate the Company's true worth, the accuracy of UBS's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning Euronav's Adjusted Financial Projections*

102.    The F-4 fails to provide material information concerning financial projections provided by Euronav's management, adjusted by Gener8's management and relied upon by UBS in its analyses.  The F-4 discloses management-prepared and adjusted financial projections for the Company which are materially misleading.  The F-4 indicates that in connection with the rendering of UBS's fairness opinion, UBS reviewed "reviewed certain internal financial information and other data relating to the business and financial prospects of Euronav that were not publicly available, including financial forecasts and estimates (a) relating to Euronav's business (other than its joint ventures) prepared by management of Euronav, as adjusted by management of Gener8, and (b) relating to Euronav's joint ventures prepared by management of Euronav, that, in each case, the Gener8 Transaction Committee and the Gener8 board of directors directed UBS to utilize for purposes of its analysis."  Accordingly, the F-4 should have, but fails to provide, certain

CLASS ACTION COMPLAINT

information in the projections that Euronav and Gener8's managements provided to the Board and UBS.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

103.    As the F-4 indicates, the projections provided by Euronav management have been adjusted by Gener8 management before being given to UBS for use in its financial analyses.  Specifically, "Gener8 management made certain adjustments to the assumptions and estimates underlying the projections received from Euronav in light of, among other things, Gener8 management's views of future tanker spot rates."  In order to provide information that is not materially misleading, Defendants must provide Euronav's unadjusted projections, as well as providing Gener8's management's view of future tanker spot rates and reasoning for the adjustments.

104.    The F-4 fails to provide material information concerning the financial projections prepared by Euronav management and adjusted by Gener8 management.  Specifically, the F-4 fails to disclose the material line items for the following metrics:

     a.   The line items used to calculate VLCC TCE, including:

          i.   voyage revenues; and

          ii.   voyage expenses.

     b.   The line items used to calculate net voyage revenues, including:

          i.   Voyage times;

          ii.   bareboat charter revenues; and

          iii.   spot voyages recognized rateably on a daily basis; and

          iv.   estimated length of each voyage.

     c.   The line items used to calculate adjusted EBITDA, including:

          i.   income;

          ii.   income from equity accounted investees;

iii.   amortization of debt financing fees;

iv.   gains (losses) on vessel sales/other tangible assets;

v.   interest expense (including commitment fees);

vi.   depreciation; and

vii.   other items, if any that neither relate to the ordinary course of Euronav's business nor reflect Euronav's underlying business performance.

d.   The line items used to calculate unlevered free cash flow, including:

i.   Proceeds from vessel sales;

ii.   Dividends received from joint ventures;

iii.   Changes in working capital;

iv.   Drydock capital expenditures; and

v.   Capital expenditures for newbuild vessels

105.   Additionally, the F-4 provides several non-International Financial Reporting Standards ("IFRS") financial metrics, including net voyage revenues, adjusted EBITDA, and unlevered free cash flows, but fails disclose a reconciliation of all non-IFRS to IFRS metrics.

106.   This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

107.   Without accurate projection data presented in the F-4, Plaintiff and other stockholders of Gener8 are unable to properly evaluate the Company's true worth, the accuracy of UBS's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning Combined Company Financial Projections*

108.   The F-4 fails to provide material information concerning financial projections for the proposed combined company created by Gener8's management and relied upon by UBS in its analyses.  The F-4 discloses management-prepared and adjusted financial projections for the

Company which are materially misleading.  The F-4 indicates that in connection with the rendering of UBS's fairness opinion, UBS reviewed "certain financial forecasts and unaudited prospective financial information relating to the Combined Company, giving effect to the Merger." Accordingly, the F-4 should have, but fails to provide, certain information in the projections for the combined company that Gener8's management provided to the Board and UBS.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

109.   As the F-4 indicates, the projections provided by Euronav management have been adjusted by Gener8 management before being given to UBS for use in its financial analyses. Specifically, "Gener8 management made certain adjustments to the assumptions and estimates underlying the projections received from Euronav in light of, among other things, Gener8 management's views of future tanker spot rates."  As such any adjusted Euronav projections used to calculate combined company projections render the latter misleading without the additional disclosure by the Defendants of Euronav's unadjusted projections, as well as providing Gener8's management's view of future tanker spot rates.

110.   The F-4 fails to provide material information concerning the financial projections for the combined company.  Specifically, the F-4 fails to disclose the material line items for the following metrics:

      a.   The line items used to calculate VLCC TCE, including:

            i.   voyage revenues; and

            ii.   voyage expenses.

      b.   The line items used to calculate net voyage revenues, including:

            i.   Voyage times;

            ii.   bareboat charter revenues; and

            iii.   spot voyages recognized rateably on a daily basis; and

            iv.   estimated length of each voyage.

c.   The line items used to calculate adjusted EBITDA, including:

     i.   Calculation methods for estimated synergies;

     ii.   Combined company G&A; and

     iii.   Basis for the 1.5% per annum increase to synergies.

d.   The line items used to calculate unlevered free cash flow, including:

     i.   Proceeds from vessel sales/other tangible assets;

     ii.   Dividends received from joint ventures;

     iii.   Changes in working capital;

     iv.   Drydock capital expenditures; and

     v.   Capital expenditures for newbuild vessels

111.   Additionally, the F-4 provides several non-International Financial Reporting Standards ("IFRS") financial metrics, including net voyage revenues, adjusted EBITDA, and unlevered free cash flows, but fails disclose a reconciliation of all non-IFRS to IFRS metrics.

112.   This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

113.   Without accurate projection data presented in the F-4, Plaintiff and other stockholders of Gener8 are unable to properly evaluate the Company's true worth, the accuracy of UBS's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by UBS*

114.   In the F-4, UBS describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

115.   With respect to the *Net Asset Value Analysis*, the F-4 Fails to disclose the following:

CLASS ACTION COMPLAINT

a. The line items used to calculate Total Fleet value, including:

    i. The individual appraisals of the tanker fleets made by each of Clarkson Valuations Limited ("Clarkson") and VesselsValue Ltd. ("VesselsValue");

    ii. In the case of Euronav,

        1. remaining capital expenditures related to contracted vessel purchases;

        2. the estimated value of Euronav's charters, excluding named vessels;

    iii. In the case of Gener8;

        1. The estimated value of Gener8's charters, excluding named vessels;

b. The specific inputs and assumptions used to calculate discount rate at 6.0% for 2017–2022 (through the end of the existing contract), and discounted at 9.0% thereafter of Euronav's projected cash flows from joint ventures;

c. Net debt; and

d. Net working capital

116. With respect to the *Gener8 Discounted Cash Flow Analysis*, the F-4 fails to disclose the following:

a. the specific inputs and assumptions used to calculate the discount rate range of 11.5% to 12.5%;

b. the specific inputs and assumptions used to calculate the terminal value range of 0.0% to 2.0%;

c. the adjustments made to the Company's normalized capital expenditures;

117. With respect to the *Euronav Discounted Cash Flow Analysis*, the F-4 fails to disclose the following:

a. the specific inputs and assumptions used to calculate the discount rate range of 9.5% to 10.5%;

CLASS ACTION COMPLAINT

b. the specific inputs and assumptions used to calculate the terminal value range of 0.0% to 2.0%

118. With respect to the *Combined Company Pro Forma for the Merger Discounted Cash Flow Analysis*, the F-4 fails to disclose the following:

a. the specific inputs and assumptions used to calculate the discount rate range of 10.4% to 11.4%;

b. the specific inputs and assumptions used to calculate the terminal value range of 0.0% to 2.0%;

c. the adjustments made to Euronav's normalized capital expenditures

119. With respect to the *Selected Public Companies Analysis*, the F-4 fails to disclose the following:

a. The specific exchange ratio used to determine the enterprise value and equity value for Gener8 and Euronav on a standalone basis;

b. The "other things" or multiples reviewed by UBS in addition to CY2017E, CY2018E and percentage of common equity value.

120. With respect to the *Selected Transactions Analysis*, the F-4 fails to disclose the following:

a. The date on which each selected transaction closed; and

b. The value of each selected transaction.

121. These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

122. Without the omitted information identified above, Gener8's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Gener8's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.

**FIRST COUNT**

**Claim for Breach of Fiduciary Duties**

**(Against the Individual Defendants)**

123. Plaintiff repeats all previous allegations as if set forth in full herein.

124. The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

125. By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Gener8.

126. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of Gener8 by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of Gener8 to its public stockholders.

127. Indeed, Defendants have accepted an offer to sell Gener8 at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

128. Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed vote on whether to approve the Merger.

129. The Individual Defendants dominate and control the business and corporate affairs of Gener8, and are in possession of private corporate information concerning Gener8's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Gener8 which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

130. By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

CLASS ACTION COMPLAINT

131.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Gener8's assets and have been and will be prevented from obtaining a fair price for their common stock.

132.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

133.     Plaintiff and the members of the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**SECOND COUNT**

**Violations of Section 14(a) of the Exchange Act**

**<u>(Against All Defendants)</u>**

134.     Plaintiff repeats all previous allegations as if set forth in full herein.

135.     Defendants have disseminated the F-4 with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

136.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.   Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

137.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

138.    The F-4 was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the F-4 is materially misleading and omits material facts that are necessary to render them non-misleading.

139.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

140.    The Individual Defendants were at least negligent in filing an F-4 that was materially misleading and/or omitted material facts necessary to make the F-4 not misleading.

141.    The misrepresentations and omissions in the F-4 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of its entitlement to decide whether to vote its shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

CLASS ACTION COMPLAINT

**THIRD COUNT**

**Violations of Section 20(a) of the Exchange Act**

**(Against all Individual Defendants)**

142.    Plaintiff repeats all previous allegations as if set forth in full herein.

143.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the F-4 was materially misleading to Company stockholders.

144.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the F-4 and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the F-4.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the F-4 before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

145.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Gener8's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the F-4 was misleading.  As a result, the

Individual Defendants are responsible for the accuracy of the F-4 and are therefore responsible and liable for the misrepresentations contained herein.

146.    The Individual Defendants acted as controlling persons of Gener8 within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Gener8 to engage in the wrongful conduct complained of herein.   The Individual Defendants controlled Gener8 and all of its employees.  As alleged above, Gener8 is a primary violator of Section 14 of the Exchange Act and SEC Rule F-4.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class, and against the Defendants, as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.      Enjoining the Proposed Transaction;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E.      Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Gener8 and obtain a transaction which is in the best interests of Gener8 and its stockholders;

F.      Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

CLASS ACTION COMPLAINT

1  H.      Granting such other and further relief as this Court may deem just and proper.

2  **DEMAND FOR JURY TRIAL**

3  Plaintiff hereby demands a jury on all issues which can be heard by a jury.

4

5  Dated: March 8, 2018                    **BRODSKY & SMITH, LLC**

6  By: _____

7  Evan J. Smith, Esquire
   240 Mineola Boulevard

8  Mineola, NY 11501
   Phone: (516) 741-4977

9  Facsimile (561) 741-0626
   esmith@brodskysmith.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT